**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

**JAMAL L. LEWIS**                                    **CIVIL ACTION**

**VERSUS**                                                **NO.  11-2665**

**STEVE RADER, WARDEN**                      **SECTION  "G"(4)**

## REPORT AND RECOMMENDATION

This matter was referred to a United States Magistrate Judge to conduct hearings, including an evidentiary hearing if necessary, and to submit proposed findings and recommendations pursuant to **28 U.S.C. § 636(b)(1)(B) and (C)**, and as applicable, **Rule 8(b) of the Rules Governing Section 2254 Cases**.  Upon review of the entire record, the Court has determined that this matter can be disposed of without an evidentiary hearing.  *See* 28 U.S.C. § 2254(e)(2) (2006).[1]

## I.     Factual and Procedural Background

The petitioner, Jamal L. Lewis ("Lewis"), is a convicted inmate incarcerated in the Dixon Correctional Institute in Jackson, Louisiana.[2]  On June 30, 2006, Lewis was charged by bill of information in Jefferson Parish with the manslaughter of Martell Callahan.[3]

---

[1]Under 28 U.S.C. § 2254(e)(2), an evidentiary hearing is held only when the petitioner shows that either the claim relies on a new, retroactive rule of constitutional law that was previously unavailable or a factual basis that could not have been previously discovered by the exercise of due diligence and the facts underlying the claim show by clear and convincing evidence that, but for the constitutional error, no reasonable jury would have convicted the petitioner.

[2]Rec. Doc. No. 1.

[3]St. Rec. Vol. 1 of 6, Bill of Information, 6/30/06.

## A.     The Investigation

The record reflects that, on April 6, 2006, Deputy Michael Poletti of the Jefferson Parish Sheriff's Office was dispatched to 1500 Westwood Drive in Marrero to investigate a reported aggravated battery.[4] Upon his arrival, he saw a black male juvenile, later identified as 15-year-old Martell Callahan ("Callahan"), lying on his stomach on a sidewalk adjacent to the parking lot of the Concordia Apartments at Westwood Drive and Lapalco Boulevard. Callahan appeared to be unconscious, and his breathing was very shallow.

Deputy Poletti asked the crowd standing around if anybody saw what happened. Shortly thereafter, an anonymous black male juvenile told the officers that a black male wearing a black T-shirt and tan pants had committed the crime. Deputy Poletti directed other deputies to secure the scene and disperse the crowd. As they were doing so, Deputy Poletti was approached by a black male wearing a black T-shirt and tan pants, later identified as Lewis, who said, "We was just playing. Is he okay?" Deputy Poletti immediately placed Lewis in handcuffs and advised him of his rights.

Lewis told the officer that he and Callahan were "play fighting," and he accidentally stabbed Callahan with a folding knife, which he threw into a wooded area across the street. Lewis stated that he and Callahan were not having an argument, nor were they mad at each other at the time of the incident. Deputy Poletti and Lewis, along with other deputies, proceeded to the wooded area and looked for the knife. They were unable to locate it.

---

[4]The facts of the case were taken from the published opinion of the Louisiana Fifth Circuit Court of Appeal on direct appeal. *State v. Lewis*, 61 So.3d 78, 80-83 (La. App. 5th Cir. 2011); St. Rec. Vol. 1 of 6, 5th Cir. Opinion, 10-KA-386, pp. 3-8, 2/15/11.

Detective Gorumba took a statement from Lewis, who was 17 years old, which was played for the jury at trial. Detective Roger Gorumba reported that Lewis had a slight abrasion to his right hand on the knuckle area. Lewis told the detective that it was received during a fight that occurred before he stabbed Callahan. Lewis also had blood on his pants, which he explained came from the knife he used to stab Callahan. In the statement, Lewis explained to detectives that before the incident either Callahan or his friend knocked on Lewis's door. Later, while he was outside, Callahan ran up to him swinging his fists while he was swinging the butterfly knife. He stated that the knife stabbed into Callahan's side. Lewis indicated that Callahan did not have anything in his hands and that Callahan's hands were balled up into fists.

Detective Gorumba also took a statement from the eyewitness, Brian Johnson, who was 13 years old. Johnson told detectives and the jury that, two or three days before the murder, he was walking through the Concordia Apartments on his way home from band practice. As he walked, he tried to call his mother on his cell phone to ask her to pick him up, because it was raining. Lewis, who he did not know, approached Johnson and asked him if he could use his cell phone. Johnson gave the cell phone to Lewis, but Lewis did not use it. When Johnson asked Lewis to return his cell phone, Lewis just walked away with it. Because of his smaller size, Johnson was afraid to confront Lewis. Johnson went home without the cell phone. He did not report the incident to his mother, because he was afraid he would be punished.

According to Johnson, on the day of the homicide, he and Callahan decided to go from Johnson's house to Nicholson Playground to play basketball. Between 3:00 p.m. and 4:00 p.m., Callahan and Johnson rode a bicycle to go to the playground. Callahan was pedaling the bicycle,

and Johnson rode on the handlebars.  They turned into the parking lot of the Concordia Apartments to avoid traffic on Westwood Drive.

As they were riding through the apartment complex parking lot, Johnson saw Lewis sitting down close to the apartments.  Johnson politely asked Lewis to return the cell phone, but Lewis did not respond.  Instead, Lewis got up and began "fussing" in a loud tone.  Lewis walked up to them, pushed Johnson off the bicycle, and talked about fighting.  Johnson told Lewis he was not going to fight him, because he was small and Lewis was big and strong.

At this point Callahan, who was about the same height as Lewis, stepped in and tried to protect Johnson.  Johnson saw Lewis walk back to his patio, and he thought Lewis was going to get the cell phone.  Lewis knelt down, picked something up, and walked back to the parking lot.

When Lewis walked back toward them, Callahan walked toward Lewis with his hands up in a boxing pose preparing to fight.  Lewis had his left hand behind his back holding his right hand.  At some point, Johnson saw that Lewis had a knife in his hand, and he called out to warn Callahan.  At that point, Lewis stabbed Callahan and ran away.  Callahan ran approximately 20 or 30 feet and then collapsed.

Johnson approached Callahan and Callahan told Johnson to use his cell phone to call his parents.  Johnson called Callahan's parents and then 911.  Right after the incident, Lewis's mother walked toward them.  When Johnson told her that Lewis had stabbed his friend, she started crying.  Johnson waited for the ambulance, which took Callahan away.  Four days later, Johnson talked to the police, and he positively identified Lewis as the perpetrator.

Dr. Karen Ross, who performed the autopsy on Callahan, determined that the cause of death was a stab wound to the abdomen.  She explained that the stab wound went through the cartilage,

liver, pancreas, splenic vein, and the two major blood vessels in the body, the aorta and the vena cava. Dr. Ross indicated that the stab wound went at least four and one-half inches deep into Callahan's body and was one inch wide. The wound was so deep it penetrated all the way through Callahan's body to his spine.

**B.**     **The Trial**

Lewis testified at trial that he met Johnson sometime in 2006. He recognized Callahan, but they were not friends. Lewis recounted that sometime before the day of the homicide, he and his friend, Alonzo, saw Johnson and a person named Greg riding in Greg's sister's car. Greg was driving, and Johnson was in the passenger seat. Greg and Johnson exited the car, and they were clowning around. The two boys eventually drove off, and Lewis and Alonzo threw iced-tea onto their car. Greg, his sister, and Johnson later came back again. Greg's sister told Lewis she wanted him to wash her car, but Lewis refused. Instead, Lewis gave Greg's sister $5.00 the next day to get the car washed. Lewis recalled that Greg and Johnson were "fussing," because they could not get the matter handled their way.

On the day of Callahan's murder, between 3:00 p.m. and 3:30 p.m., Lewis walked home from work. As he was walking through the Concordia Apartments, Greg and Alonzo exited a car, and another "dude" was driving. Greg ran toward Lewis, and they fought for a minute. After the fight, Lewis went inside of his apartment, 13C, and talked to his girlfriend on the phone. While on the phone, Lewis played with his butterfly knife, which he described as "cool" and "fancy."

While he was on the phone, about an hour after the fight with Greg, Lewis heard a knock on the door, and his sister told him that Alonzo was at the door for him. When Lewis looked out the window, he saw Alonzo walking off. Lewis hurried downstairs while he was still talking on the

phone, and he put the knife in his pocket. Lewis went outside and saw Johnson and Callahan in front of Alonzo's apartment at 13A.

Callahan said to Lewis, "You had a fight with my friend." When Lewis asked Callahan the identity of his friend, Callahan said, "Greg." Johnson had a gray metal pole in his hand, and Johnson and Callahan were standing next to each other. Lewis did not go back inside, because he did not want to turn his back on Johnson and Callahan. Lewis was frightened, because Callahan was talking about "smashing" him, which he took to mean that Callahan was going to beat him up or kill him.

Lewis then pulled out the knife that was in his pocket to scare Johnson and Callahan, and he tossed the phone to Alonzo. Lewis told Johnson and Callahan to get away from him and that he did not want any problems with them. Callahan walked up to Lewis, who backed up. Callahan then charged Lewis and swung his fist at him. Lewis swung at Callahan with the knife and hit him once, but he did not intend to hit him. Afterward, Lewis retrieved his phone from Alonzo, and he called 911 as he returned to his apartment.

After Lewis called 911, he went back outside. Lewis was scared, so, he removed the knife from his pocket, walked down the street, threw it in the woods, and went back inside. He later went outside again and asked the police if Callahan was alright. The police told him that he fit the description of the suspect. Lewis told Detective Gorumba that he was just playing, he did not mean to do it, and he was only trying to scare Callahan. Lewis denied telling Deputy Poletti that he and Callahan were not arguing and not mad at each other.

Lewis indicated at trial that he had two other convictions, one for aggravated battery which occurred two days before the Callahan homicide and one for having contraband in a correctional

facility. He pled guilty to both offenses on June 13, 2007, and received two concurrent one-year sentences before the trial in this case.

Lewis was tried as an adult before a jury on October 20, 21, and 22, 2009, and was found guilty as charged of manslaughter.[5] At a hearing held October 29, 2009, the Trial Court denied Lewis's motions for new trial and for post-verdict judgment of acquittal.[6] The Court sentenced Lewis to serve 40 years in prison at hard labor without benefit of probation or suspension of sentence.[7] The Court also later denied Lewis's motion to reconsider the sentence.[8]

### C.    Post-Trial Proceedings

On February 4, 2010, Lewis submitted to the Trial Court an application for post-conviction relief in which he raised the following grounds for relief in support of his request for leave to file an out-of-time appeal:[9] (1) the evidence was insufficient to support the verdict; (2) the Trial Court erred in admitting other crimes evidence; (3) the Trial Court erred in failing to require the State to provide race-neutral reasons for striking black jurors in violation of *Batson*;[10] (4) ineffective assistance of counsel; and (5) the sentence was excessive. The Trial Court dismissed the application

---

[5]St. Rec. Vol. 1 of 6, Trial Minutes, 10/20/09; Trial Minutes, 10/21/09; Trial Minutes, 10/22/09; Verdict of the Jury, 10/22/09; St. Rec. Vol. 4 of 6, Trial Transcript, 10/21/09; St. Rec. Vol. 5 of 6, Trial Transcript, 10/22/09.

[6]St. Rec. Vol. 1 of 6, Sentencing Minutes, 10/29/09; Motion for New Trial, 10/29/09; Motion for Post-Verdict Judgment of Acquittal, 10/29/09; St. Rec. Vol. 5 of 6, Sentencing Transcript, 10/29/09.

[7]St. Rec. Vol. 1 of 6, Sentencing Minutes, 10/29/09; Reasons for Sentence, 12/14/09; St. Rec. Vol. 5 of 6, Sentencing Transcript, 10/29/09.

[8]St. Rec. Vol. 1 of 6, Motion to Reconsider Sentence, 11/9/09; Trial Court Order, 11/30/09.

[9]St. Rec. Vol. 1 of 6, Uniform Application for Post-Conviction Relief, 2/10/10 (dated 2/4/10).

[10]*Batson v. Kentucky*, 476 U.S. 79 (1986).

as moot on March 9, 2010, because Lewis's motion for appeal had been granted on November 30, 2009, and counsel had already been appointed for him.[11]

On direct appeal to the Louisiana Fifth Circuit Court of Appeal, Lewis's appointed counsel raised two assignments of error:[12] (1) the evidence was insufficient to support the verdict, because the evidence only proved the elements of negligent homicide; and (2) the maximum 40-year sentence was excessive, because he was a juvenile who did not have intent to kill or inflict great bodily harm upon the victim. Lewis was granted leave to file a *pro se* supplemental appellate brief; however, the record does not reflect that any such brief was filed.[13]

On February 15, 2011, the Louisiana Fifth Circuit affirmed Lewis's conviction, finding no merit in the claims raised.[14] On its errors patent review, the Court also found that the commitment indicated that the sentence was imposed without benefit of parole, probation or suspension of sentence, and the transcript did not include the restriction on parole. The Court remanded the matter for the Trial Court to correct the commitment to read as the transcript. This was accomplished on March 16, 2011.[15] The appellate court also advised Lewis that, contrary to the Trial Court's statement, the prescriptive period for filing for post-conviction relief runs from finality of the conviction.

---

[11]St. Rec. Vol. 1 of 6, Trial Court Order, 3/9/10.

[12]St. Rec. Vol. 5 of 6, Appeal Brief, 10-KA-0386, 6/2/10.

[13]St. Rec. Vol. 5 of 6, Motion for Leave, 10-KA-0386, 6/14/10.

[14]*State v. Lewis*, 61 So.3d at 86, 87; St. Rec. Vol. 1 of 6, 5th Cir. Opinion, 10-KA-386, pp. 11, 14, 2/15/11.

[15]St. Rec. Vol. 1 of 6, Minute Entry, 3/16/11.

On September 23, 2011, the Louisiana Supreme Court denied without stated reasons Lewis's subsequent writ application in which he raised the same two claims.[16] Lewis's conviction became final 90 days later, on June 2, 2011, when he did not file a writ of certiorari with the United States Supreme Court. *Ott v. Johnson*, 192 F.3d 510, 513 (5th Cir. 1999) (period for filing for certiorari with the United States Supreme Court is considered in the finality determination under 28 U.S.C. § 2244(d)(1)(A)); U.S. S. Ct. Rule 13(1).

## II.     Federal Habeas Petition

On October 26, 2011, the clerk of this Court filed Lewis's petition for federal habeas corpus relief in which he raised tow grounds for relief:[17] (1) the State failed to prove beyond a reasonable doubt that petitioner committed manslaughter rather than negligent homicide; and (2) petitioner received an unconstitutionally excessive sentence. He requests that his conviction be reversed and that he be released with the matter remanded to the state trial court for a new trial.

The State filed a response in opposition to Lewis's petition conceding timeliness and exhaustion. The State further argues that Lewis's claims are without merit under federal law and should be dismissed for that reason.

## III.     General Standards of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214,[18] applies to this petition, which is deemed filed in this Court under the federal

---

[16]*State v. Lewis*, 69 So.3d 1156 (La. 2011); St. Rec. Vol. 6 of 6, La. S. Ct. Order, 2011-KO-0459, 9/23/11; La. S. Ct. Writ Application, 11-KO-459, 3/4/11 (dated 3/3/11); St. Rec. Vol. 1 of 6, La. S. Ct. Letter, 2011-KO-459, 3/4/11 (showing postal meter 3/2/11).

[17]Rec. Doc. No. 1, p. 14.

[18]The AEDPA comprehensively revised federal habeas corpus legislation, including 28 U.S.C. § 2254, and applied to habeas petitions filed after its effective date, April 24, 1996. *Flanagan v. Johnson*, 154 F.3d 196, 198 (5th Cir. 1998) (citing *Lindh v. Murphy*, 521 U.S. 320 (1997)). The AEDPA, signed into law on that date, does not specify

mailbox rule on October 10, 2011.[19]  The threshold questions in habeas review under the amended statute are whether the petition is timely and whether the claim raised by the petitioner was adjudicated on the merits in state court; *i.e.*, the petitioner must have exhausted state court remedies and must not be in "procedural default" on a claim.  *Nobles v. Johnson*, 127 F.3d 409, 419-20 (5th Cir. 1997) (citing 28 U.S.C. § 2254(b)-(c) (2006)).

In this case, the State conceded, and the Court has determined that, Lewis's petition was timely filed and his two claims are exhausted.  The Court will address the substance of his claims.

## IV.    Standards of Review of the Merits

The AEDPA standard of review is governed by § 2254(d) and the Supreme Court's decision in *Williams v. Taylor*, 529 U.S. 362 (2000).  It provides different standards for questions of fact, questions of law, and mixed questions of fact and law.

A state court's determinations of questions of fact are presumed correct and the court must give deference to the state court findings unless they were based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  28 U.S.C. § 2254(d)(2) (2006); *see Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000), *cert. denied*, 532 U.S. 1039 (2001).  The amended statute also codifies the "presumption of correctness" that attaches to state court

---

an effective date for its non-capital habeas corpus amendments.  Absent legislative intent to the contrary, statutes become effective at the moment they are signed into law.  *United States v. Sherrod*, 964 F.2d 1501, 1505 n.11 (5th Cir. 1992).

[19]The Fifth Circuit has recognized that a "mailbox rule" applies to pleadings, including habeas corpus petitions filed after the effective date of the AEDPA, submitted to federal courts by prisoners acting *pro se*.  Under this rule, the date when prison officials receive the pleading from the inmate for delivery to the court is considered the time of filing for limitations purposes. *Coleman v. Johnson*, 184 F.3d 398, 401 (5th Cir. 1999), *cert. denied*, 529 U.S. 1057 (2000); *Spotville v. Cain*, 149 F.3d 374, 378 (5th Cir. 1998); *Cooper v. Brookshire*, 70 F.3d 377, 379 (5th Cir. 1995).  The clerk of court filed Lewis's petition on October 26, 2011, when pauper status was granted.  Lewis dated his signature on the memorandum attached to his form petition on October 10, 2011.  This is the earliest date on which he could have submitted the pleadings to prison officials for mailing to this Court.

findings of fact and the "clear and convincing evidence" burden placed on a petitioner who attempts to overcome that presumption. 28 U.S.C. § 2254(e)(1) (2006).

A state court's determination of questions of law and mixed questions of law and fact are reviewed under § 2254(d)(1), as amended by the AEDPA. The standard provides that deference be given to the state court's decision unless the decision is "contrary to or involves an unreasonable application of clearly established federal law" as determined by the United States Supreme Court. *Hill*, 210 F.3d at 485.

A state court's decision can be "contrary to" federal law if: (1) the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law; or (2) the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams*, 529 U.S. at 405-06, 412-13; *Penry v. Johnson*, 532 U.S. 782, 792-93 (2001); *Hill*, 210 F.3d at 485. A state court's decision can involve an "unreasonable application" of federal law if it either: (1) correctly identifies the governing rule but then applies it unreasonably to the facts; or (2) extends or fails to extend a clearly established legal principle to a new context in a way that is objectively unreasonable. *Williams*, 529 U.S. at 406-08, 413; *Penry*, 532 U.S. at 792.

The Supreme Court in *Williams* did not specifically define "unreasonable" in the context of decisions involving unreasonable applications of federal law. *cf. Wright v. West*, 505 U.S. 277, 304 (1992). The court, however, noted that an unreasonable application of federal law is different from an incorrect application of federal law. *See, e.g., id.* at 305; *see also Chambers v. Johnson*, 218 F.3d 360, 364 (5th Cir. 2000), *cert. denied*, 531 U.S. 1002 (2000). "'[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state-court decision applied [a Supreme Court case] incorrectly.'" *Price v. Vincent*, 538 U.S. 634, 641 (2003)

(quoting *Woodford v. Visciotti*, 537 U.S. 19, 24-25 (2002)) (brackets in original); *Bell v. Cone*, 535 U.S. 685, 699 (2002)).

Thus, under the "unreasonable application" determination, the Court need not determine whether the state court's reasoning is sound, rather "the only question for a federal habeas court is whether the state court's determination is objectively unreasonable." *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002). The burden is on the petitioner to show that the state court applied the precedent to the facts of his case in an objectively unreasonable manner. *Price*, 538 U.S. at 641 (quoting *Woodford*, 537 U.S. at 24-25); *Wright v. Quarterman*, 470 F.3d 581, 585 (5th Cir. 2006). In addition, review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits. *Cullen v. Pinholster*, __ U.S. __, 131 S. Ct. 1388, 1398 (2011).

## V.      Sufficiency of the Evidence to Support the Manslaughter Verdict

Lewis alleges that the evidence was insufficient to support a conviction of manslaughter. He contends that the evidence at best only proved negligent homicide. He argues that the case hinged on a credibility determination between Johnson's testimony and his own and consideration of the inconclusive physical evidence regarding the amount of force used to cause the injury to Callahan's fatal wound. He claims that the evidence did not establish an intent to kill, because he went inside after the stabbing to call 911 and because he repeatedly told police that it was an accident. He further argues that not every reasonable hypothesis of innocence was excluded by the circumstantial evidence brought at trial as required by Louisiana law.

Lewis's counsel raised this claim on direct appeal to the Louisiana Fifth Circuit. The Court denied relief and resolved that the evidence was sufficient under the standards in *Jackson v. Virginia*, 443 U.S. 307 (1979), and related state case law. In its published decision, the Louisiana

Fifth Circuit resolved that the credibility resolution between the stories presented by Johnson and Lewis was within the sound discretion of the jury and not to be re-weighed on appeal. The Court resolved that, based on the witness testimony and the testimony of Dr. Ross regarding the injuries, the jury was reasonable in finding each of the manslaughter elements to have been proven. This was the last reasoned decision on the issue since the Louisiana Supreme Court denied the subsequent writ application without reasons. *See Ylst*, 501 U.S. at 802.

Claims of insufficient evidence present a mixed question of law and fact. *Perez v. Cain*, 529 F.3d 588, 594 (5th Cir. 2008). The Court must therefore give deference to the state court's findings unless the decision was contrary to, or involved an unreasonable application of *Jackson*. *Gilley v. Collins*, 968 F.2d 465, 467 (5th Cir. 1992) (citing *Schrader v. Whitley*, 904 F.2d 282, 284 (5th Cir. 1990)). The appropriate standard for determining the sufficiency of evidence is that set forth by the United States Supreme Court in *Jackson*, which was relied upon by the state appellate court.

As noted by Lewis, Louisiana law allows a crime to be proven by circumstantial evidence. Under Louisiana law, "[t]he rule as to circumstantial evidence is: assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." La. Rev. Stat. Ann. § 15:438. However, on federal habeas corpus review, the court does not apply this state law, "reasonable hypothesis" standard, but must apply the *Jackson* and AEDPA standards of review. *Gilley*, 968 F.2d at 467 (citing *Schrader*, 904 F.2d at 284).

As for the circumstantial evidence rule itself, "[t]his is not a purely separate test from the *Jackson* standard to be applied instead of a sufficiency of the evidence test . . . . Ultimately, all evidence, both direct and circumstantial, must be sufficient under *Jackson* to satisfy a rational juror that the defendant is guilty beyond a reasonable doubt." *State v. Porretto*, 468 So. 2d 1142, 1146

(La. 1985); *accord State v. Williams*, 693 So. 2d 204, 208 (La. App. 4th Cir. 1997). The reasonable hypothesis standard under state law is "just an evidentiary guide for the jury. If a rational trier of fact reasonably rejects the defendant's hypothesis of innocence, that hypothesis fails." *State v. Maxie*, 614 So. 2d 1318, 1321 (La. App. 3d Cir. 1993); *accord State v. Williams*, 693 So. 2d at 208. The appropriate standard for this Court remains *Jackson*.

Under *Jackson*, 443 U.S. at 307, a court must determine, after viewing the evidence in the light most favorable to the prosecution, whether a rational trier of fact could have found the essential elements of the crime to have been proven beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Perez*, 529 F.3d at 594; *Williams v. Cain*, 408 Fed. Appx. 817, 821 (5th Cir. 2011). To determine whether the commission of a crime is adequately supported by the record, the court must review the substantive elements of the crime as defined by state law. *Perez*, 529 F.3d at 594 (citing *Jackson*, 443 U.S. at 324 n.16); *Weeks v. Scott*, 55 F.3d 1059, 1062 (5th Cir. 1995).

The court's consideration of the sufficiency of the evidence extends only to what was presented at trial. *See McDaniel v. Brown*, __U.S. __, 130 S. Ct. 665, 672, 673 (2010) (recognizing that a reviewing court is to consider the trial evidence as a whole under *Jackson*); *Johnson v. Cain*, 347 Fed. Appx. 89, 91 (5th Cir. 2009) (*Jackson* standard relies "upon the record evidence adduced at trial.") (quoting *Jackson*, 443 U.S. at 324). Review of the sufficiency of the evidence, however, does not include review of the weight of the evidence or the credibility of the witnesses; those determinations are the exclusive province of the jury. *United States v. Young*, 107 Fed. Appx. 442, 443 (5th Cir. 2004) (citing *United States v. Garcia*, 995 F.2d 556, 561 (5th Cir. 1993); *see also Jackson*, 443 U.S. at 319 (noting that it is the jury's responsibility "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate

facts."). Thus, all credibility choices and conflicting inferences are to be resolved in favor of the verdict. *Ramirez v. Dretke*, 398 F.3d 691, 695 (5th Cir. 2005). A reviewing habeas court is not authorized to substitute its interpretation of the evidence or the credibility of witnesses for that of the fact-finder. *Weeks*, 55 F.3d at 1062. In addition, "[t]he *Jackson* inquiry 'does not focus on whether the trier of fact made the correct guilt or innocence determination, but rather whether it made a rational decision to convict or acquit.'" *Santellan v. Cockrell*, 271 F.3d 190, 193 (5th Cir. 2001) (quoting *Herrera v. Collins*, 506 U.S. 390, 402 (1993)).

In this case, Lewis was charged with and convicted of manslaughter. In Louisiana, manslaughter is defined as a homicide which otherwise would be first or second degree murder, with specific intent to kill or commit great bodily harm, "but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection." La. Rev. Stat. Ann. § 14:31(A)(1); *State v. Logan*, 34 So.3d 528 (La. App. 2d Cir. 2010); *State v. Quiambao*, 833 So.2d 1103 (La. App. 2d Cir. 2002). In addition, manslaughter can also be "[a] homicide committed, without any intent to cause death or great bodily harm . . . [w]hen the offender is engaged in the perpetration or attempted perpetration of any felony not enumerated in Article 30 or 30.1, or of any intentional misdemeanor directly affecting the person."[20] La. Rev. Stat. Ann. § 14:31(A)(2)(a).

In Lewis's case, the jury was instructed on both "specific intent manslaughter," La. Rev. Stat. Ann. § 14:31(A)(1), and "felony/misdemeanor manslaughter," La. Rev. Stat. Ann. §

---

[20]La. Rev. Stat. Ann. §14:30 and § 14:30.1 define first and second degree murder. These provisions list the felonies of aggravated kidnapping, second degree kidnapping, aggravated escape, aggravated arson, aggravated rape, forcible rape, aggravated burglary, armed robbery, assault by drive-by shooting, first degree robbery, second degree robbery, simple robbery, terrorism, cruelty to juveniles, or second degree cruelty to juveniles.

14:31(A)(2)(a), as defined above.[21]  In connection with the latter theory, the jury also was provided

instruction on the definitions of aggravated battery, simple battery, and aggravated assault.[22]  The

Louisiana Fifth Circuit reiterated these definitions in its opinion on direct appeal:

> A battery is the intentional use of force or violence upon the person of another.  A simple battery is a battery committed without the consent of the victim.  Simple battery is a general intent offense.  An aggravated battery is a battery committed with a dangerous weapon.  Aggravated battery also requires proof of general intent.  General criminal intent is present when the circumstances indicate that the offender, in the ordinary course of human experience, must have adverted to the prescribed criminal consequences as reasonably certain to result from his act or failure to act.  General intent may be proved by evidence that the defendant did the acts which have been declared criminal.  The fact that a defendant does not specifically intend the greater degree of harm to the victim does not prevent the jury from taking into account the reasonably foreseeable consequences, which aggravate the seriousness of the battery offense, in assessing the defendant's culpability.
> An assault is an attempt to commit a battery, or the intentional placing of another in reasonable apprehension of receiving a battery.  An aggravated assault is an assault committed with a dangerous weapon.  An aggravated assault conviction requires proof of only general criminal intent.

(footnotes omitted) *State v. Lewis*, 61 So.3d at 84-85 (citing La. Rev. Stat. Ann. § 14:10(2), §14:33-

37, *State v. Edwards*, 957 So.2d 185, 190 (La. App. 5th Cir. 2007), *State v. Hill*, 796 So.2d 127, 131

(La App. 2d Cir. 2001), and *State v. Lee*, 826 So.2d 616, 623 (La. App. 4th Cir. 2002)); St. Rec. Vol.

1 of 6, 5th Cir. Opinion, 10-KA-386, p. 10, 2/15/11.

Under Louisiana law, "'[s]udden passion' and 'heat of blood' are not elements of the offense

of manslaughter; rather, they are mitigatory factors in the nature of a defense which exhibit a degree

of culpability less than that present when the homicide is committed without them." *State v. Logan*,

34 So.3d at 535 (citing *State v. Lombard*, 486 So.2d 106 (La. 1986)); *State v. Laird*, 30 So.3d 1167

(La. App. 3rd Cir. 2010).  Thus, it is the defendant's burden to prove by a preponderance of the

---

[21]*See State v. Lewis*, 61 So.3d at 84; St. Rec. Vol. 1 of 6, 5th Cir. Opinion, 10-KA-386, p. 9, 14, 2/15/11.

[22]*See State v. Lewis*, 61 So.3d at 84-85; St. Rec. Vol. 1 of 6, 5th Cir. Opinion, 10-KA-386, pp. 9-10, 14, 2/15/11.

evidence that he acted in "sudden passion" or "heat of blood" for a verdict of manslaughter to be appropriate. *State v. Robinson*, 754 So.2d 311 (La. App. 2d Cir. 2000). Also, based on the statutory definition, proof of specific intent to kill is not necessary for the State to obtain a conviction of manslaughter. *State v. Hutcherson*, 785 So.2d 140 (La. App. 2d Cir. 2001); *State v. Jones*, 4 So.3d 950 (La. App. 2d Cir. 2009).

In reaching its decision, the Louisiana Fifth Circuit recognized that the jury was presented with two versions of the fight that led to Callahan's stabbing and other conflicting and inconsistent testimony. The Court resolved that, in light of the verdict, the jury found the state's witnesses and their version to be more credible than that of Lewis. Considering the testimony of the State's witnesses about the circumstances of the stabbing and Dr. Ross's testimony regarding the severity of Callahan's wound, the Court resolved that the jury could have found all of the elements of manslaughter to have been proven beyond a reasonable doubt.

As noted by the Louisiana Fifth Circuit, Lewis did not deny that he stabbed Callahan. The crux of the case and his argument here points to his contention that the stabbing was accidental, without an intent to kill or cause great bodily harm to Callahan and thus was only negligent homicide, if the jury had believed his story. The jury was instructed on the lesser offense of negligent homicide. The jury obviously discredited Lewis and found him guilty of manslaughter, the charged offense.

As noted above, in reaching its decision on the sufficiency of the evidence, the Louisiana Fifth Circuit referenced the State's evidence and witness testimony in finding the jury's verdict to be reasonable. The record supports this resolve.

Relative to Callahan's murder, on behalf of the State, the jury heard the testimony of Dr. Karen Ross from the Jefferson Parish Coroner's Office.[23] She testified that the stab wound went through the ninth costal cartilage which attaches the rib to the breastbone.[24] The wound was one inch long and went at least four to four and a half inches into the body.[25] It appeared to have been made by a single-edged knife blade.[26] The wound was located at the lower part of his rib cage on the left side. After entering there, the knife went slightly downward through the liver, the pancreas, the splenic vein, the aorta, and the inferior vena cava, just below where the blood vessels to the kidney are given off.[27] The wound pierced the two major arteries, the aorta and the vena cava, and caused excessive internal bleeding.[28]

Dr. Ross found this stab wound to be the cause of death.[29] She opined that it would have taken a significant amount of force to go through the skin and then the cartilage.[30] The wound went all the way through Callahan's body to the spine, where it struck the aorta and vena cava.[31] The wound was consistent with a deliberate stabbing rather than an accidental sharp force.[32]

--------

[23]St. Rec. Vol. 4 of 6, Trial Transcript, p. 6, 10/21/09.

[24]*Id*., p. 11.

[25]*Id*., p. 12.

[26]*Id*.

[27]*Id*., pp. 12, 18.

[28]*Id*., p. 12.

[29]*Id*., p. 13.

[30]*Id*.

[31]*Id*., p. 14.

[32]*Id*., pp. 18-19.

The jury also heard the testimony of Brian Jackson, the 13-year-old who witnessed the stabbing.[33] He testified that two or three days before the murder, he was heading home from band practice at his school, which was behind the Concordia Apartments.[34] He walked through the apartment complex because it was a shorter route home.[35] While walking through the complex, it was raining, so he tried to call his mother on his cell phone to pick him up.[36]

Lewis approached Johnson as he walked and asked if he could use the cell phone.[37] Lewis took the phone from Johnson and then walked away with it, even after Johnson asked for it back.[38] Johnson was younger with a small build, and he was afraid of Lewis.[39] He went home and did not tell his mother about the phone, because he did not want to be punished.[40]

On the day of the murder, Callahan and Johnson were together at Johnson's house.[41] Between 3:00 p.m. and 4:00 p.m., they decided to go play basketball at Nicholson Park.[42] They did not have a basketball, which they would borrow from the gym when they got there.[43] They rode on

---

[33]*Id.*, p. 32.

[34]*Id.*, p. 34.

[35]*Id.*, p. 35.

[36]*Id.*, pp. 34, 37-38.

[37]*Id.*, p. 38.

[38]*Id.*

[39]*Id.*, pp. 38-39.

[40]*Id.*, pp. 39-40.

[41]*Id.*, p. 42.

[42]*Id.*, p. 42, 44. The park is later identified as Nichols Park.

[43]*Id.*, p. 80.

one bicycle with Callahan pedaling and Johnson sitting on the handlebar.[44]  They turned into the

Concordia Apartments to cut through as a short cut to the park.

As they rode through the parking lot of the complex, they saw Lewis sitting near an

apartment.[45]  Johnson asked him for his phone back.[46]  Lewis did not say anything.  He instead stood

up in place and began to fuss in a loud tone.  Lewis then walked up to the Callahan and Johnson and

pushed Johnson off of the bicycle.[47]  Lewis began talking about fighting, but Johnson was smaller

and did not want to fight.[48]

The bigger Callahan, who was 15 years old, became protective of Johnson, and told Lewis

that he would fight in Johnson's place.  At that point, Lewis walked back to his patio where he

earlier had been sitting.  Lewis knelt down and picked something up off of the ground.[49]  Lewis

walked back toward Callahan, who was standing with his fists up next to his neck and face preparing

to fight.[50]  Callahan and Lewis slowly walked toward each other.  When they stopped near each

other, Callahan still had his fists raised, and Lewis had his left hand behind his back holding his right

---

[44]*Id.*, p. 44.

[45]*Id.*, p. 47.

[46]*Id.*, p. 48.

[47]*Id.*, p. 49.

[48]*Id.*, p. 50.

[49]*Id.*, p. 51.

[50]*Id.*, p. 52.

hand.  Johnson soon saw that Lewis had a knife in his hand, and he called out to warn Callahan.[51]

Lewis then stabbed Callahan.[52]

Johnson further testified that Lewis ran after the stabbing.[53]  Callahan tried to run and collapsed after about 20 or 30 feet.  After he fell to the ground, he told Johnson to take the cell phone from his pocket to call his parents.  Johnson complied, and he also called 911.

Just after the stabbing, Lewis's mother walked over, and Johnson told her that Lewis had stabbed Callahan.[54] Johnson stayed at the scene until Callahan was taken away by ambulance.[55] He, however, did not talk to police until four days later, because he was scared to tell his parents what happened.[56]  At that time, he identified Lewis for police.

Deputy Michael Poletti of the Jefferson Parish Sheriff's Office was the first officer to arrive at the scene.[57]  He found Callahan laying face down and unconscious, and his breathing was shallow.[58]  An unidentified young boy told him that a black male wearing a black T-shirt and tan pants did the stabbing.  As he looked around for someone fitting that description, the young boy disappeared.  The deputy directed the other deputies to secure the scene and disperse the crowd so that the EMS personnel could work on the victim.

---

[51]*Id.*, pp. 53-54.

[52]*Id.*, p. 54.

[53]*Id.*, p. 55.

[54]*Id.*, p. 56.

[55]*Id.*, p. 58.

[56]*Id.*, pp. 58-59.

[57]*Id.*, p. 85.

[58]*Id.*, p. 86.

At some point, a black male wearing a black T-shirt and tan pants approached the deputy and said: "We was just playing. Is he okay?"[59] He identified this person as Lewis. The deputy placed him in handcuffs and read him the *Miranda* warnings. He took Lewis to his police unit and explained his rights again and let him read a Jefferson Parish Rights of Arrestee form, which Lewis signed.[60] The officer arrested Lewis for aggravated battery.[61]

Lewis gave Deputy Poletti a statement in which he said that he and Callahan were play-fighting and that he accidentally stabbed Callahan with a folding knife.[62] He told the deputy that he threw the knife into a wooded area across the street about 150 yards from where the stabbing occurred.[63] The deputy, Lewis, and other deputies went to that area to search for the knife but to no avail.

When they returned to Deputy Poletti's vehicle near the crime scene, Lewis told him that he and Callahan were not arguing or mad at each other when this happened. Lewis did not tell the officer anything about being attacked, or that Johnson had a metal pipe, or that he acted in self-defense, as he was now claiming for the first time at trial. When the ranking detectives arrived, Deputy Poletti turned Lewis over to Detective Roger Gorumba.

Detective Gorumba of the Jefferson Parish Sheriff's Office testified that he arrived at the scene after it was secured and the victim had been transported to the hospital.[64] Lewis had already

---

[59]*Id.*, p. 87.

[60]*Id.*, p. 88, 90.

[61]*Id.*, p. 89.

[62]*Id.*, p. 90.

[63]*Id.*, p. 91.

[64]*Id.*, pp. 106, 108.

given a statement to another officer.[65]  After they learned that Callahan died, he transported Lewis to his office at the investigation bureau for an interview.  He again provided Lewis with another rights form which he signed.[66]  The detective then conducted a taped interview which also was played for the jury.[67]  The jury also was shown pictures of Lewis at the time of the statement which showed a cut on his hand from an earlier fight and a blood spot on his pants which came from the knife used to stab Callahan.[68]

Detective Gorumba also later interviewed Johnson about the incident.[69]  The statement was recorded, but the recording device failed to capture the entire statement.[70]

The jury was also provided information by Deputy Billy Lewis regarding the 911 calls made by Lewis and Johnson on the day of the murder.[71]  He also introduced pictures showing a memorial at the Nichols Park[72] indicating or confirming that Callahan did play basketball at that playground.[73]

Based on the verdict, the jury apparently found the State's evidence and testimony to be the more credible version of the facts.  The determination of the credibility of a witness is within the province of the jury and is not to be disturbed on habeas review.  *Passman v. Blackburn*, 652 F.2d

---

[65]*Id.*, p. 108.

[66]*Id.*, pp. 108-09.

[67]*Id.*, pp. 110-12.

[68]*Id.*, p. 114.

[69]*Id.*, p. 119.

[70]*Id.*, p. 120.

[71]*Id.*, p. 136.

[72]Previously referred to as Nicholson Park.

[73]*Id.*, pp. 149-50.

559, 569 (5th Cir. 1981) (that the jury chose to believe a witness whose credibility was challenged is not a question of constitutional dimensions); *Holderfield v. Jones*, 903 F. Supp. 1011, 1018 (E.D. La. 1995) (citing *U.S. v. Hatch*, 926 F.2d 387, 399 (5th Cir. 1991)) (The habeas court should defer to the jury's resolution of credibility determinations and justifiable inferences of fact.).  The jury's resolve was reasonable and supported by the evidence and testimony.

The evidence of record, taken in a light most favorable to the prosecution, was sufficient to establish that Lewis, after briefly arguing with Johnson and Callahan, obtained and secreted a knife and without warning, thrust the knife into Callahan's body with enough force to pierce his body from the front lower rib area into his abdomen about four to four and one-half inches through to the spine, causing critical damage to major organs and arteries.  This was sufficient to demonstrate a specific intent to kill or commit great bodily harm upon Callahan and/or that the deadly stabbing occurred during the commission of an aggravated battery (for which Lewis was originally arrested), simple battery, or aggravated assault as defined by Louisiana law.

The state court's denial of relief on this claim was not contrary to, or an unreasonable application of *Jackson*.  Lewis is not entitled to relief on this claim.

**VI.    Constitutionality of the Sentence**

Lewis alleges that the 40 year sentence he received was excessive under Louisiana law, because he was only 17 when the incident occurred, and he did not intend to kill or inflict great bodily harm on the victim.  He also argues that his testimony and actions after the murder showed his remorse and regret.

Under a broad reading, Lewis also argues that the sentence under the circumstances was grossly disproportionate to the crime and fails to contribute to the acceptable goals of punishment.

He further suggests that the Trial Court did not provide reasons for the sentence as required by La. Code Crim. P. art. 894.1 and related state law. He also now claims that the Callahan and Johnson were the aggressors who came to his home looking for a fight, and he should not be punished with the maximum sentence.[74]

His counsel raised this claim on direct appeal. The Louisiana Fifth Circuit found the claim to be meritless on the basis that the Trial Court provided thorough reasons for imposing the sentence, all of which were supported by the record. The Trial Court referenced Lewis's unsupported claim of self-defense, noting that his claim was raised for the first time at trial that 13-year-old Johnson carried a pipe. The Trial Court also found that Lewis was the aggressor and could have but did not retreat from the situation; he instead chose to stab Callahan resulting in his death. The Trial Court also noted that while Lewis did call 911, he had a history of fighting, including a fight two days earlier in that same location with a mentally challenged boy.

The Louisiana Fifth Circuit found these reasons to be adequate support for the sentence. The Court also emphasized the egregious nature of the crime, including the fact that 15-year-old Callahan was defending the smaller 13-year-old Johnson from Lewis's threats. The Court further referenced that Lewis had a criminal history, and that this was not his first adult offense, having pleaded guilty to aggravated battery in the incident with the mentally challenged victim mentioned by the Trial Court and pleaded guilty to bringing contraband into a prison facility. The Court also noted that Lewis had been in an unrelated fight with other boys just hours before he stabbed Callahan. The Court found no abuse of discretion under state law for the sentence. This was the last reasoned opinion issued by a state court on this issue. *Ylst*.

---

[74]While these arguments actually were not presented to the state courts in support of this claim, the failure to fully exhaust the arguments does not prevent this Court from denying relief on the claim. 28 U.S.C. § 2254(b)(2).

Lewis suggests that the Trial Court failed to address the relevant sentencing factors found in La. Code Crim. P. art. 894.1. The Trial Court entered its reasons for sentencing[75] and those reasons were thoroughly reviewed by the Louisiana Fifth Circuit on direct appeal. The Trial Court complied with La. Code Crim. P. art. 894.1, which requires that the sentencing court states its reasons for sentencing.

Nevertheless, to the extent Lewis argues that his sentence is excessive or otherwise inappropriate under Louisiana law, that claim is not cognizable in this federal proceeding. Federal habeas corpus relief is available only for violations of federal constitutional law and, therefore, this Court does not sit to review alleged errors of state law. *See Swarthout v. Cooke*, __ U.S. __, 131 S. Ct. 859, 861 (2011) (federal habeas review does not lie for errors of or in applying state law); *Narvaiz v. Johnson*, 134 F.3d 688, 695 (5th Cir. 1998). Accordingly, this Court will not review the state court's findings regarding the constitutionality of Lewis's sentence under state law.

With regard to his contention that his sentence is excessive under the Eighth Amendment, his claim is without merit. Federal courts accord broad discretion to a state trial court's sentencing decision that falls within statutory limits. *Haynes v. Butler*, 825 F. 2d 921, 923-24 (5th Cir. 1987); *Turner v. Cain*, 199 F.3d 437, 1999 WL 1067559, at *3 (5th Cir. Oct. 15, 1999) (Table, Text in Westlaw) (sentence was within Louisiana statutory limits and within trial court's discretion, therefore petitioner failed to state cognizable habeas claim for excessive sentence). As here, if a sentence is within the statutory limits, a federal habeas court will not upset the terms of the sentence unless it is shown to be grossly disproportionate to the gravity of the offense. *See Harmelin v. Michigan*, 501 U.S. 957 (1991); *Solem v. Helm*, 463 U.S. 277 (1983).

---

[75]*See* St. Rec. Vol. 1 of 6, Reasons for Sentence, 12/14/09; St. Rec. Vol. 5 of 6, Sentencing Transcript, 10/29/09.

The United States Supreme Court has stated that "'[t]he Eighth Amendment does not require strict proportionality between crime and sentence. Rather, it forbids only extreme sentences that are 'grossly disproportionate' to the crime.'" *Ewing v. California*, 528 U.S. 11, 23 (2003) (quoting *Harmelin*, 501 U.S. at 1001 (Kennedy J., concurring in part and concurring in judgment)). The Supreme Court has recognized that only the rare case will reach the level of gross disproportionality. *Id.*, 538 U.S. at 30 (quoting *Harmelin*, 501 U.S. at 1005). In those rare cases, "when a threshold comparison of the crime committed to the sentence imposed leads to an inference of 'gross disproportionality,'" a court then considers (a) the sentences imposed on other criminals in the same jurisdiction; and (b) the sentences imposed for commission of the same offense in other jurisdictions. *Smallwood v. Johnson*, 73 F.3d 1343, 1346-47 (5th Cir. 1996); *McGruder v. Puckett*, 954 F.2d 313, 316 (5th Cir. 1992).

A federal court, however, will not review a state imposed sentence within the statutory limits without a threshold showing that the sentence is "grossly disproportionate to the offense" so to be completely arbitrary and shocking. *See Smallwood*, 73 F.3d at 1347; *Bonner v. Henderson*, 517 F.2d 135, 136 (5th Cir. 1975). Therefore, if a sentence is within the statutory limits, a federal habeas court will not upset the terms of that sentence, unless it is first shown to be disproportionate to the offense as to be completely arbitrary and shocking. *Id*.

Under Louisiana law, a person convicted of manslaughter shall be imprisoned at hard labor for not more than 40 years. La. Rev. Stat. Ann. § 14:31(B). Lewis's sentence was within the range provided under Louisiana law.

Louisiana courts have regularly imposed the maximum 40-year prison sentence in similar cases of manslaughter involving youthful perpetrators and/or victims. *State v. Lewis*, 48 So.3d 1073

(La. 2010) (30 year sentence imposed on 16-year-old found guilty of manslaughter in shooting death of 18-year-old friend after fighting over a cigar filled with marijuana); *State v. Jones*, 924 So.2d 1113 (La. App. 5th Cir. 2006) (40 year sentence for manslaughter of 17-year-old victim appropriate where defendant armed himself before confronting victim with whom he had prior fights); *see also*, *State v. Allen*, 954 So.2d 779 (La. App. 4th Cir. 2007) (40 year sentence for manslaughter appropriate where defendant, who had prior convictions, stabbed someone whom he thought had stolen his wallet); *State v. Williams*, 776 So.2d 604 (La. App. 4th Cir. 2000) (the defendant sentenced to 40 years for manslaughter when he opened fire in the apartment of a man with whom he had previously fought).

Nothing Lewis has presented distinguishes his situation from other cases in Louisiana in which 40-year prison sentences were imposed under similar circumstances. He has not demonstrated that his sentence was disproportionate to the crime for which he was convicted or otherwise out of line with the sentences imposed in similar cases. The state courts' finding that his sentence was not excessive was not contrary to, or an unreasonable application of, Supreme Court precedent. He is not entitled to relief on this claim.

**VII.    Recommendation**

For the foregoing reasons, it is **RECOMMENDED** that Jamal L. Lewis's petition for the issuance of a writ of habeas corpus filed pursuant to 28 U.S.C. § 2254 as amended be **DENIED** and **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation **within fourteen (14) days** after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on

appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996).[76]

New Orleans, Louisiana, this 17th day of April, 2012.

_____
**KAREN WELLS ROBY**
**UNITED STATES MAGISTRATE JUDGE**

---

[76]*Douglass* referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend the period to fourteen days.